## No. 10,839.

## CHARLES K. BURDEAU VS. HIS CREDITORS.

1. When the charge of *fraud* preferred against an insolvent is, that in certain transactions with certain of his creditors, he made *unfair dations en paiement* to them of his property, whereby he gave such creditors an *undue* advantage over the complaining creditor, and the effect of which was to *injure* such complainant, the *gravamen* of such charge is (1) intention on the part of the insolvent to defraud, and (2) *injury* to the complainant resulting therefrom.

2. The proof disclosing that the dispositions made of his property, by the insolvent, resulted in his having received therefrom a cash surplus above the amount of the claims of the creditors, who were paid sufficient to satisfy the complainant's demand. *Held:* that whatever may be the inference therefrom of fraudulent intent on the part of the insolvent, there was no *resulting injury* to the complainant. There may have been a *consilium fraudis*, but no *eventus damni*.

APPEAL from the Civil District Court for the Parish of Orleans. *Voorhies, J.*

*George L. Bright* for Plaintiff and Appellee.

*Gurley & Mellen* for Opponents and Appellants:

Fraudulent intent can never be absolutely proved; it can only be inferred.

Therefore, the law presumes from certain acts a fraudulent intent on the part of him who commits them. This presumption is sometimes inconclusive, and may be rebutted (Sec. 1804, R. S.), and sometimes *conclusive* (Arts. 3359 and 3360, C. C.).

The legal presumption of a fraudulent intent is *conclusive* where the act complained of is a *dation en paiement* made by an insolvent *within* three months preceding his surrender, whereby the donee obtains an unjust advantage and preference over other creditors, especially when property purchased from another creditor and not paid for is given to the favored creditor, and the insolvent was hopelessly insolvent at the time of making the *dation en paiement*.

The opinion of the Court was delivered by

WATKINS, J. Seeking the benefit of the insolvent laws of the State, Charles K. Burdeau made a cession of his property to his creditors, filed a schedule of his assets, accompanied with a list of his creditors, and obtained an order of the judge accepting same for the benefit of his creditors.

At a meeting of the creditors of the insolvent, duly convoked, a majority in number and amount voted for his discharge—there being only four who voted against his discharge—their debts aggregating

$5490.66, or about one-fifth of the aggregate of the claims of those voting for a discharge.

Of those voting against a discharge, was the firm of Marx Levy & Bro., whose claim amounts to $3526.61, who filed an opposition to the discharge of the insolvent based on three specific charges of fraud; and whereupon said opponents pray that there be a judgment of court " depriving said Burdeau forever of the laws in favor of insolvents in this State, and sentencing him to imprisonment for a term not exceeding three years, as provided by Section No. 1807 of the Revised Statutes," and for a trial by jury.

The answer or replication of the defendant was a general and special denial, and a plea in reconvention which cuts no figure in this case.

On the trial the jury rendered a verdict acquitting the insolvent of the charge of fraud; and, having unsuccessfully sought a new trial, opponents have prosecuted this appeal from the final judgment rendered in favor of the insolvent.

We have therefore for solution, the single and distinct issue, fraud *vel non*, as denounced in the eighteen hundred and seventh (1807) section of the Revised Statutes; and, finding that the insolvent " has been *guilty* of fraud," as therein denounced, we have for decision the *quantum* of punishment that shall be inflicted on him.

I

The charges and specifications made by the opponent are substantially as follows, to-wit:

1. (a) That on or about the 25th of January, 1889, the insolvent transferred and delivered to Martin Thompson & Co., horse and mule traders of the city of New Orleans, twenty (20) mules, at an agreed valuation of $145 per head, " all or some of said mules being given by said Burdeau to said Martin Thompson & Co., in payment of the indebtedness then due by him to said firm."

(b) That on or about the 16th of February, 1889, said insolvent transferred and delivered to Wm. B. Leonard, of said city, or to the firm of Leonard, Gentry & Co., of which said Leonard was the senior member, ten (10) mules, at an agreed valuation of $160 per head. That said Burdeau was then largely indebted to said Leonard, or to his firm, say $1600, " and said mules were given to said Leonard or his firm in payment of said indebtedness."

(c) That on or about the 28th of February, 1889, said insolvent being indebted to said Leonard or his firm, " transferred and delivered to him or to his firm, ten (10) mules, at an agreed valuation of $160 per head in payment of said debt."

(d) That on the 18th day of March, 1889, said insolvent transferred and delivered to said Leonard or to his firm, ten (10) mules, at an agreed valuation of $147.50 per head, " and said mules were given said Leonard or his said firm in payment of said indebtedness."

(e) That on or about the 3d day of April, 1889, said insolvent, being then indebted to said firm of [Martin Thompson & Co., " transferred and delivered to said firm seven (7) mules, at an agreed valuation of $160 per head, as a giving in payment of said indebtedness."

Predicated upon these five preceding specifications, the opponents make the following specific charges, to-wit:

" That said Burdeau made each and every one of said *dations en paiement* within three months prior to his surrender, was insolvent when he made them, and *made them with intent to defraud his creditors*, and particularly opponents, and to give an unfair preference to said Martin Thompson & Co., and to said W. B. Leonard or his said firm of Leonard, Gentry & Co."

The opponents, varying the character of the charge previously made, declare and affirm as follows, to-wit:

2. (a) " But if said Burdeau should claim that said transfers were not *dations en paiement*, but real sales, and such be the truth, then the amount received by him for said fifty-seven (57) mules was $8695 or thereabouts, and he has surrendered no cash; although said sales were made within three months prior to his surrender, he has paid out in cash, between the date of the first sale and the day of his surrender, only the sum of $492.28, so far as opponents are informed and know.

" And if said transfers were sales and not *dations en paiement*, then opponents charge said Burdeau with *converting his property into cash with intent to place it beyond the reach of these opponents and other creditors, and so to defraud them.    That said Burdeau has not surrendered said cash, nor any part thereof, but has fraudulently concealed the same.*"

3. That the insolvent has failed and refused to surrender to his creditors his interest in the firm of Jos. A. Aiken & Co., wharf lessees in this city, he being a member of that firm.

The charges and specifications are well and accurately drawn, and are of easy comprehension, but before considering them and applying the evidence thereto, we must examine and dispose of an exception that was urged in the court below and is pressed by the insolvent's counsel here.

## II.

His exception is that "the three charges are (1) fraudulent sales, (2) *dations en paiement*, and (3) non-surrender of the prices received for the sales predicated on the same transfer.

"The first two can not exist at the same time. If he gave the mules in payment, he can not have sold them and concealed the price received, for none was received. If he paid the price, he can not have given the mules in payment."

Counsel's contention is that the plain requirement of the insolvent law is that an opposing creditor must state *specifically* the several acts or facts of fraud he wants to urge against the insolvent, and that the opponent has not done so.

He cites and relies upon the following authorities, viz.: Beste vs. His Creditors, 14 An. 518; Burdon vs. His Creditors, 20 An. 366; Campbell vs. His Creditors, 16 La. 351.

Giving these decisions due weight and conceding their applicability to the state of facts therein respectively presented, yet we can not concede their pertinency to the case at bar.

The particular transactions of the insolvent which are denounced as fraudulent are detailed and fully described. It was a matter of utter impossibility for the opponents to have known when the opposition was filed, whether they were sales in good faith for cash, the proceeds whereof were concealed from the insolvent's creditors, or reprobated *dations en paiement*, consequently the acts were particularized and the charges of fraud were specified alternatively. It was a strike in the dark, and the best that could have been done under the circumstances.

Counsel complains that the opposition failed to state that the insolvent "knowingly omitted to declare some of his property," in the words of the statute. R. S., Sec. 1803.

We think the phrase employed, "fraudulently concealed," is sufficient.

The exception was correctly overruled

### III.

As appertaining to the merits of the controversy, the facts may be fairly summarized as follows, viz.:

Charles K. Burdeau and W. C. Ahern were the individual members who composed the firm of Burdeau & Ahern, and were engaged in the draying business, hauling cotton for the cotton compresses, in the season of 1888-89.

As was the custom of the trade, they bought mules in the fall season to operate their business with, and made sales of some of them during the latter part of the winter and spring, when business became dull and unremunerative.

Burdeau purchased mules of the various parties named, and for which he owed, on January 25, 1889, to Martin Thompson & Co. $2602.25, on open account; he owed Leonard, Gentry & Co. $1782.43, represented by his promissory note, due on that date; and he owed the opponent's firm of Marx Levy & Bros. $3526.61, evidenced by two promissory notes, bearing date January 11, 1889; one for $2005.28, due at ninety (90) days, and another for $1992.28, due at sixty days, but which was, on the date it went to maturity, diminished by the partial payment of $500, and the payment thereof was extended.

At the date of the maturity of their debt, Burdeau disposed of *twenty* of his mules to Martin Thompson & Co., at $145 per head, realizing therefor the aggregate sum of $2900, with which his entire account was discharged—they paying him the difference of $297.75.

On the 3d of April, 1889, Burdeau sold to said firm *seven* (7) mules, at $160 per head, aggregating in amount $1100, for which he received a check.

On the 13th of January, 1889, Burdeau made a sale of *ten* (10) mules to the firm of Leonard, Gentry & Co., at $160 per head, aggregating the sum of $1600, on which he was given a check for only $800, the remainder not being at that time paid.

On the 17th of February Burdeau delivered to said firm *ten* (10) mules in addition, at $160 per head, aggregating $1600.

On the following day he was furnished a check for $1782.43—the exact amount of his note, that day maturing—and he used it in paying his note in the Canal Bank.

On the 2d of March, 1889, he received a check of $617.57, thus " evening up " those two transactions.

On th 18th of March, following, Burdeau sold to said firm *ten* (10) mules, in addition, at $147.50 per head, aggregating $1475 in amount, and he received a check of $250 on the 19th of March, and one for $1225 on the 23d of March, 1889.

The *result* of the transactions with Martin Thompson & Co. was that Burdeau satisfied their account of $2602.25 and received, in cash, the surplus of $1397.75; and the result of his transactions with Leonard, Gentry & Co. was that he satisfied their demand of $1782.43, and received in cash the surplus or $2892.57, the cash items reaching a total of $4290.32.

The manner in which said mules were disposed of was this: The time having arrived when, in the opinion of the partners, it was necessary that their stock of mules should be reduced, Mr. Ahern selected the mules that were to be sold and put them in suitable lots; and different dealers were notified and examined these lots, and made bids therefor at so much per head. In this case the two firms mentioned were competitors, and secured the mules specified above, and at the prices and on the terms stated.

In the latter part of December, 1888, opponent's firm was notified of it being the intention of the insolvent's firm to sell off some of their mules, and the former were questioned as to whether they would like to buy, and their reply was in the negative. Thereafter no further notice was given them of the said sales being made.

On this state of facts the question is whether those transactions were fraudulent *dations en paiement*, which were, on the part of the insolvent, *intended* to confer on Martin Thompson & Co., and Leonard, Gentry & Co., an *unfair* preference over opponents, and the effect of which was to injure them—in the sense of the provisions of the insolvent law, upon which opponents rely for a conviction.

The transcript fails to disclose any specific *proof* of fraud or fraudulent intent; and the insolvent emphatically and circumstantially denies and disavows any such intention or act. The only inference there is of any such fraudulent purpose or design must be drawn from the foregoing statement of facts.

It is a fact that should be noted, that all of the parties named dealt with Burdeau alone, in selling mules to him and in purchasing mules from him—notwithstanding the fact that the latter at once covered same into his partnership, and the sales were made as of partnership property.

The precept of the insolvent law that is sought to be enforced against the insolvent, Burdeau, is that—

" If the jury summoned for the purpose of deciding on *the accusation of fraud* against the insolvent debtor declare in their verdict that he has been *guilty of fraud*, the insolvent debtor shall forever be deprived of the laws passed in favor of insolvent debtors in this State, and shall be sentenced to imprisonment for a term not exceeding three years," etc.    R. S., Sec. 1807.

In the sections of the Revised Statutes immediately preceding the one quoted, we find the term "fraud" defined, and the character of proof necessary to convict supplemented by illustrations and examples, in the way of fraudulent acts, which come within the provisions of the statute under consideration.   For instance, Section 1802 declares that "all persons shall be *guilty of fraud* who shall have *concealed* their body, or *any of their property, with an intention to keep it from their creditors*," etc.   Section 1803 says that "every insolvent debtor shall *also be considered as guilty of fraud* who shall have passed simulated deeds for the purpose of conveying the whole or any part of the property, and depriving his creditors thereof, *or shall have knowingly omitted to declare any of his property, right or claims in his schedule,*  *  *  *  *always with an intent to defraud his creditors,*" etc.

For the perpetration of any one of the acts enumerated, or others of like import, the insolvent is deemed, and considered to be, a *fraudulent* debtor, *per se.*

Section 1804 declares that "*if a debtor* who has voluntarily surrendered his property to his creditors  *  *  *  shall have given *within the year an unjust advantage* or *preference* to any one or more of his creditors, by payment or otherwise,  *  *  *  the *effect whereof shall be to injure the complaining creditor*, or shall *purchase property for cash*, the delivery whereof shall be made to him, and *then shall sell or dispose of the same without paying his vendor*,  *  *  *  or shall have made a *conveyance, transfer, mortgage*, or *pledge of his property, to the prejudice of the complaining creditor, any such act shall be held presumptive evidence of fraud, liable, however, like all other presumptions, to be disproved.*"

Whether the insolvent be *guilty of fraud* or not, under this section, is, in the first place, dependent on a question of fact as to the insolvent's commission of the reprobated act; and, in the second

2

place, on the *fact* of his having successfully rebutted the legal *presumption of guilty intent* raised on the proof of the act.

Coupled with the foregoing sections are the supplemental provisions of Section 1808, which are to the effect that: "Any debtor who shall, *within three months next preceding his failure,* have *sold, engaged,* or *mortgaged* any of his goods and effects, or shall *otherwise have disposed of the same, in order to give an unjust preference to one or more of his creditors, shall be debarred* from the benefit of *the insolvent laws,*" etc.

It thus appears to have been the manifest purpose of the Legislature in this section (1808) to declare that the acts which, in Section 1804, are denounced as "presumptive evidence of fraud" if done "within the year" previous to the surrender of an insolvent,. shall be deemed a *conclusive presumption of fraud,* if done "within *three months* next preceding his failure;" and as a legal consequence thereof the insolvent "shall be debarred from the benefit of the insolvent laws."

But, in order to determine the *main* question, the insolvent's *guilt of fraud,* under and in contemplation of the sections of the Revised Statutes we have quoted, we are to first ascertain whether, as matter of fact, Burdeau did give, *within the year,* "an *unjust* advantage or preference to any one or more of his creditors, by payment or otherwise,   *   *   *   the *effect of which* (was) to injure the complaining creditor." Or did he make "a conveyance, transfer, mortgage or pledge of his property to the prejudice of the complaining creditor,"—within the meaning of Section 1804?

If such we find to have been a fact, then the next question to be determined is, whether the act or acts complained occurred *within three months* preceding the failure or surrender in contemplation of Section 1808.

We have already found and stated that there is in the record no specific proof of fraud on the part of the insolvent. Is there to be legitimately drawn from the facts stated any inference of any *unjust* advantage or preference having been given by him to Martin Thompson & Co. or Leonard, Gentry & Co. over the opponents, the *effect whereof* was to *injure* the opponents?

These precepts of the insolvent law have often been examined and interpreted, and·in so doing our predecessors have said that they are

highly penal in character, and in their consequences on conviction of fraud, "and must be strictly pursued. The acts charged must not only be such as the law declares fraudulent, but *done with fraudulent intent.*" Campbell vs. Creditors, 16 La. 348.

In other cases they have said:

"To constitute fraud there must be an intention of defrauding, *consilium fraudis*, and an actual loss, *eventus damni*" Montilly vs. Creditors, 18 La. 383; Slocumb vs. Real Estate Bank, 2 R. 92.

Those decisions conform strictly to the precise wording of the statute; for it declares not only that the act complained of must have conferred, or have been intended to confer, on some of the creditors of the insolvent an "*unjust* preference or advantage" over the creditor who charges fraud, but it also declares that "the *effect whereof* shall be to *injure*" him.

The transactions of which the opponents complain are specifically enumerated in the opposition, and same have been reproduced in this opinion with care. They are charged, collectively, as badges of fraud and *unfair dations en paiement.*

Upon examination and careful comparison, we find that, by one of Burdeau's transactions with certain of his creditors, he not only paid their account of $2602.25, but received from them a *cash* surplus of $1397.75.

That by another of his transactions with others of his creditors, he not only paid a debt due them of $1782.43, but received from them a *cash* surplus of $2892.57—*i. e.*, a cash surplus of $4290.32 in excess of their demands against him altogether.

As all of those transactions occurred during the months of January, February, March and April, and *antecedent* to the maturity of Burdeau's indebtedness to the opponents, and as the amount of cash realized therefrom exceeded the amount of opponents' demands against him, it seems to be manifest that "the effect" of same was not to injure them.

Indeed, it is a fact, exhibited by the record, that, contemporaneously with said transactions, Burdeau paid opponents $500, which was put to his credit on their first maturing note, and it was extended for the remainder, and that said sum was *not part* of the cash so received. On the 17th of April, 1889, opponents levied an attachment on Burdeau's property, and the sheriff found and seized ten (10) mules—one-half as many as opponents sold him originally

—those having remained on hand and unsold at date of seizure; also eleven (11) sets of harness, and fifteen (15) cotton floats, and some other property, not needing mention.

Hence, on this branch of the case, our conclusion is that opponents' appeal can not prevail.

### IV.

But, coupled with the foregoing charge, is a further specification of fraud on the part of the insolvent, and it is this: That on the 25th of January, 1889, Burdeau had, in all, sixty-seven (67) mules, fifty-seven (57) of which he had bought in 1888. That of those, he had purchased twenty (20) of opponents, seventeen of which he had disposed of, as above stated, to other parties, to the prejudice of opponents' vendor's lien.

The provisions of Section 1804 of the Revised Statutes, above quoted, on this subject are, that if an insolvent "shall purchase property for cash, the delivery whereof shall be made to him, and then shall sell or dispose of the same without paying his vendor, * * * such act shall be held presumptive evidence of fraud."

Certainly that provision of the law was not intended to apply to sales of property, or goods and effects, on terms of credit, as the sales of mules were made to Burdeau. For it is a precept of our Civil Code that the vendor's lien on movable property is lost by a sale and delivery thereof to another.

It declares " that he who has sold to another any movable property which is not paid for, has a preference on the price of his property over other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser." R. C. C. 3227; Brent vs. Shouse, 16 An. 158; 20 An. 548, 557.

Evidently there is no prohibition against a sale being made by a vendee of goods which are purchased on a credit; and no fraudulent intent can attach to the act, though his contract be thereby violated.

As a matter of fact, had it been the intention of Burdeau to defraud opponents by selling mules on which opponents had a vendor's lien, it is inexplicable that he should have retained three and sold seventeen; for after Burdeau's surrender opponents appeared in the insolvency proceedings, and made claim for the proceeds of three mules on which they had a vendor's lien, and it was allowed. This charge is not sustained.

## V.

The remaining question for consideration is, that Burdeau was guilty of fraud in "*concealing his cash* with intent to defraud his creditors." Page 3 of opponent's supplemental brief. Their counsel disavow any intention on their part to charge that the insolvent "*knowingly omitted* to declare (some) of his property rights and claims in his schedule."

The charge is made under Section 1802, and not under Section 1803 of the Revised Statutes. This charge is the alternation that is made mention of in the treatment of the insolvent's exception.

(*a*) And just here we may as well dispose of the insolvent's bill of exception taken to the ruling of the judge *a quo* rejecting a *memorandum* made up by him, of various and sundry expenditures, indicating the manner in which he had disposed of the *cash* he had received in the transactions detailed, and in the course of his business.

The unbending rule of law is that "the book of a merchant'can not be given in evidence in his favor." R. C. C. 2248; 1 Greenleaf, Sec. 115.

It proceeds on this principle, that the entries therein are his own *memoranda*, and he can not be allowed to manufacture evidence in his own favor.

As an aid to the memory of a witness testifying, this *memorandum* was objectionable on the ground that it did not purport to be *contemporaneous* in date with the transaction therein detailed.

It was properly excluded.

(*b*) On the question of the insolvent having *concealed* his cash to defraud his creditors, there is no evidence that is at all satisfactory or conclusive. The general tendency of it is to show that Burdeau had *spent* all of his money, and at date of his surrender had none. He denies the possession or concealment of any cash, and avers that at that time he did not have a cent, and that under the advice of counsel he sold a pony and a wagon for $125, to meet the expenses of his cession, and surrendered that to his creditors. Such an item prefaces his schedule. In his testimony he accounts for all his cash except a few hundred dollars, which he claims to have expended in the payment of small dues and the like. We do not consider this charge as supported by the evidence.

(c) This is not in any sense a revocatory action or one *en declaratione de simulation*, and, hence, the precepts of the codes do not apply. R. C. C. 1983, 1984, 2658, 3630.

(d) In so far as the charge that Burdeau had failed to surrender his interest in the firm of Joseph A. Aiken & Co., wharf lessees, is concerned, it has been only recently decided by this court, in a suit in which his syndic was a party, that the interest therein represented by Burdeau was not his own, but that of his minor children. And to that suit opponents were, at least, privies, if not parties, as it was in their interest and at their instance that it was brought. Burdeau, Tutor, vs. Davy, Syndic, *ante* 585.

Certain it is that, under the circumstances detailed, we do not feel justified in *reversing* the finding of the jury, acquitting the insolvent of the charge of fraud, in view of the District Judge's declination to grant opponents a new trial.

Our predecessors once held that the insolvent law furnished a remedy " of such a highly penal character that we would never feel authorized to *convict* the debtor of the fraud and punish him with an imprisonment, which might extend to three years, *without the verdict of a jury*." Thompson vs. Chapman, 7 An. 258.

While not adhering to this doctrine, save for the illustration it affords, we will affirm this *not* to be *such* a case as will justify this court in reversing a verdict and sentencing the insolvent to the penalty of the law.

Judgment affirmed.